# United States Court of Appeals
## For the First Circuit

No. 14-1156

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD GRAF,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Barron, Circuit Judges.

Jonathan G. Mermin, with whom Preti, Flaherty, Beliveau & Pachios, LLP was on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, District of Maine, was on brief, for appellee.

April 21, 2015

**THOMPSON, <u>Circuit Judge</u>.** Working on a tip from a confidential informant, police searched defendant-appellant Richard Graf's home, turning up marijuana and an illegal gun. Graf was subsequently indicted on drug and firearm charges.

He moved in a pre-trial motion to suppress the seized evidence, arguing to a Maine federal magistrate judge that to sweet-talk a state court justice of the peace into signing off on the search warrant application, a police detective sugarcoated the facts in his sworn statement accompanying it. As part of his motion to suppress, Graf also requested an evidentiary hearing to challenge the affiant-detective's credibility.

Neither the magistrate judge nor the district court was convinced and denied the motion. Graf now appeals the denial, arguing that he was entitled to a full hearing to challenge the detective's veracity, and the magistrate judge improperly allowed the government to investigate itself before deciding his motion to suppress.

Despite a valiant effort, we affirm the lower court.

## BACKGROUND

### The Controversial Warrant Affidavit

In April 2011, Carl Gottardi, a detective lieutenant for the Somerset County Sheriff's Department in Maine, applied for a warrant to search Graf's home. The warrant application was

supported by Gottardi's sworn statement, to which we'll refer from now on as "the Graf affidavit."

In the Graf affidavit, Gottardi attested he had probable cause to believe Graf was hiding marijuana and other drug *accoutrements* in his home, based on information Gottardi received from a confidential informant called "11-25." 11-25 "ha[d] been a very reliable informant . . . for the past several years," and had helped "obtain[] numerous drug search warrants, . . . with numerous persons being charged and convicted of various . . . drug offenses," Gottardi swore. 11-25 had "also provided other law enforcement officials with reliable drug related information in the past."

Specific to this case, Gottardi also wrote in the affidavit that 11-25 relayed his personal knowledge that "for several years [] Graf has continually sold large amounts of marijuana," describing the location of the "camp type residence" where Graf sold his "high grade, commercial type" stuff.[1] Relying on Gottardi's affidavit, a state Justice of the Peace signed off on the warrant,[2] and during the search of Graf's home, police found

---

[1] To maintain the informant's confidentiality, the affidavit did not state one way or another whether 11-25's preferred gender pronoun was "he" or "she." For readability purposes only, we will refer to 11-25 as "he."

[2] In Maine, justices of the peace, who are not necessarily judges but could be attorneys or other court officials, are permitted to issue search warrants.

-3-

marijuana plants and an unregistered short-barreled shotgun.  Not surprisingly, Graf was indicted on federal firearms possession and drug charges.

### Graf's *Franks* Motions

In <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154, 155-56 (1978), the Supreme Court held that a defendant is entitled to an evidentiary hearing to "challenge the veracity of a sworn statement used by police to procure a search warrant," if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  In August 2011, Graf asked the federal trial court for one of these so-called <u>Franks</u> hearings, arguing that he should be able to test the veracity of the statements Gottardi made in his warrant affidavit.  Graf maintained via a sworn-to affidavit that at best, Gottardi embellished 11-25's reliability, but more likely, either Gottardi or the informant was simply lying.  In addition to a hearing, Graf also asked that the evidence seized from his home be suppressed.  Other than his affidavit, Graf supported his motion with nothing further.

A magistrate judge denied the motion because, as she put it, Graf did "not allege, [or] . . . attempt to make a substantial preliminary showing, that [] Gottardi knowingly and intentionally

made false statements in the search warrant affidavit or included statements in reckless disregard of the truth." Rather, the magistrate judge decided, Graf "relie[d] entirely on the theory that the confidential informant gave Gottardi inaccurate information," which was not enough for a Franks hearing.

Graf's team was undeterred, and his new lawyer decided to get to the bottom of things himself by digging up all the warrant applications filed by the Somerset County Sheriff's Department from April 2009 through April 2012 and searching for all references to "11-25." Turns out, there were none, that is, no warrant applications filed prior to April 2011 (which was when Gottardi got the warrant to search Graf's home) naming "11-25" as an informant. "11-25" did appear, however, in two of the warrant applications filed after Graf's, but in each of the three affidavits where "11-25" was mentioned, the informant's background and history as a tipster were described a little differently.

Armed with this new information, Graf marched back into court and filed a second motion to suppress and request for a Franks hearing. This second go-round, Graf argued that he now had proof Gottardi "displayed a reckless disregard for the truth by exaggerating CI 11-25's reliability and use in the past."[3]

---

[3] Curiously enough, Graf also argued to the trial court that the informant lied about ever being on Graf's property, evident because one, the directions the informant gave to Graf's house were incorrect and, two, were the informant ever actually there, he would have seen the sixty-eight marijuana plants "growing in plain

-5-

The government fired off an explanation, though, and in support of its opposition to the motion, submitted a supplemental affidavit from Gottardi describing his "practice to periodically change the identifying numbers assigned to confidential informants." Gottardi also claimed that "the person designated CI 11-25 in the Graf search warrant has been assigned four identifying numbers during the course of" his work with Gottardi. In addition, "[o]ccasionally, identifying numbers will be re-used for different persons," Gottardi swore.[4]

Graf shot back, arguing that even if Gottardi was telling the truth about these so-called practices of his, "[b]y assigning the same CI numbers to three different individuals on three different drug cases over a five month period, Gottardi is misleading those officials who are tasked with reviewing affidavits in support of search warrants." Gottardi's unconventional practice, Graf urged, "is meant to enhance the credibility of the [informant] whose number repeatedly appeared before the same [reviewing official], even though, according to Gottardi, they are different people."

_____

sight" on Graf's property. Graf, however, did not pursue on appeal the informant's unreliability as an additional basis for discrediting Gottardi's affidavit.

[4] Gottardi's affidavit suggests that these practices are his personal ones, and not necessarily the ones sanctioned by the sheriff's office or other law enforcement. Indeed, the government conceded at oral argument that reusing the same number for different informants is "highly irregular."

-6-

## Magistrate's Preliminary Order

In response, the magistrate judge issued a preliminary order noting that she was "not persuaded that Defendant ha[d] made a <u>substantial</u> preliminary showing that Lt. Gottardi supplied . . . false representations concerning the background of 11-25 as described in his [April] 2011 warrant application." The judge explained: "[t]he mere fact that there is no earlier warrant application involving an informant identified as 11-25 readily can be explained by a practice of changing an informant's numerical identifier over time."

Still, Graf had "raised a serious concern" by "expos[ing] an irregular practice of identifying confidential informants that raises some cause for concern about Lt. Gottardi's underlying affidavit." The court noted that "assigning the same numerical identifier to three different confidential informants within a relatively brief timespan" was a "surprising revelation about what seems . . . a highly irregular, ill-advised, and potentially misleading procedure." Thus, the magistrate judge observed, Gottardi's second affidavit "raises as many questions as it resolves."

Given her lingering concerns, the judge ordered the government to "investigate this matter to assure itself" that 11-25 not only existed, but also was whom Gottardi claimed. Specifically, the government was to file an <u>in camera</u> report

-7-

addressing whether: the "11-25 described in the April 2011 warrant application is an ascertainable individual with the history and 'pedigree' Lt. Gottardi has attributed to him"; "there were prior matters in which this same 11-25 (under whatever other identifier) supplied information supporting drug search warrants"; and "there were in fact three separate informants identified as 11-25 between April and October of 2011." The judge also ordered that the "investigating individual [] be someone other than the prosecuting attorney assigned to this specific case and [] not be employed by the Somerset County Sheriff's Department or the Bureau of Alcohol, Tobacco or Firearms ["ATF"]."[5] The investigation would "enable [the court] to determine whether [] a showing might be plausible if a Franks hearing were convened."

## Amendments to the Preliminary Order

Shortly after the magistrate judge entered the preliminary order, the government filed a motion requesting that an ATF agent be permitted to conduct the investigation. The judge held a telephone conference to hear the parties. She expressed her confusion about the government's motion; she had assumed the investigation would be akin to a paralegal from the U.S. Attorney's office simply "reviewing paperwork as opposed to a lot of field work and interviews and so on." The government responded that it

_____

[5] ATF was the agency that presented Graf's case to the U.S. Attorney's Office to prosecute.

assumed the court wanted "an agent actually going out and attempting to interview 11-25 and interviewing Mr. Gottardi and -- to gather those facts that the Court asked that we investigate." Despite the court's clarification of its expectations, the government pressed that it was "reluctant" to have someone from its office investigate because that person could later be called as a witness to answer "some additional questions that might not be apparent from the report."

Graf objected, arguing that the court should assign a "neutral third party" to conduct the investigation, as opposed to someone from an agency that helped procure his prosecution. But over Graf's objection, the court allowed the government's request in part and ordered that an ATF agent could "conduct the investigation subject to the limitation that the ATF agent in charge of this case not be the one who conducts" it.

### The ATF Report

On January 4, 2013, the government submitted its report to the court in camera. In the report, ATF Special Agent Christopher Durkin stated that in addition to interviewing Gottardi, other police officers, and the informant designated as 11-25 in the Graf affidavit, he also reviewed warrant applications from other cases to confirm Gottardi's statements in the affidavit.

Satisfied after reviewing the report, the magistrate judge concluded that Graf did not make "a substantial preliminary

showing that [] Gottardi . . . or any other law enforcement officer, made untruthful or deliberately misleading statements in the affidavit," and recommended that the trial judge deny Graf's request for a Franks hearing.  The district court judge adopted the magistrate judge's recommendation, over Graf's objection, also denying Graf's motion to suppress.

Graf ended up pleading guilty to possessing an unregistered shotgun and manufacturing marijuana, reserving his right to appeal the denial of his motion to suppress.  The district court sentenced him to two years in prison, among other conditions.

This timely appeal followed.

**STANDARDS OF REVIEW**

"We review the denial of a Franks hearing for clear error."  United States v. Reiner, 500 F.3d 10, 14 (1st Cir. 2007) (citation omitted).  Clear error "exists only when we are left with the definite and firm conviction that a mistake has been committed."  United States v. Hicks, 575 F.3d 130, 138 (1st Cir. 2009) (citation and quotations omitted).

"We apply a mixed standard of review to the district court's denial of a motion to suppress, reviewing findings of fact for clear error and conclusions of law, including whether a particular set of facts constitutes probable cause, de novo."  United States v. Belton, 520 F.3d 80, 82 (1st Cir. 2008) (citation omitted).  "To prevail, [a defendant] must show that no reasonable

view of the evidence supports the denial of the motion to suppress." Id. (citation omitted).

## DISCUSSION

Graf's main argument on appeal is that the trial court erred by denying him the opportunity to challenge Gottardi's affidavit at a formal Franks evidentiary hearing, where he would have had been able to cross-examine Gottardi. More specifically, Graf relies on out-of-circuit precedent to argue that "the court should not give the government an opportunity to present its evidence on the validity of the warrant" without holding a "full evidentiary Franks hearing."[6] Graf also offers the secondary argument that even if the lower court did not procedurally err in hearing out the government before making its Franks ruling, the particular procedure chosen by the magistrate judge -- to allow ATF, a government entity, to investigate the truthfulness of Graf's

---

[6] We note that Graf does not appear to have raised this argument to the district court. To the contrary, in his response to the government's opposition to his motion to suppress, Graf actually uses Gottardi's supplemental affidavit to boost his own case -- Gottardi's "false information about using [the informant] previously and overstat[ing] the charges he was facing," and "that Gottardi constantly changes CI's in a way which makes little sense," "[w]hen combined together," "presents this Court with the requisite 'substantial preliminary showing' that Gottardi's affidavit contains false statements." Generally, we deem arguments not raised before the district court waived. Millay v. Me. Dep't of Labor, Bureau of Rehab., Div. for Blind & Visually Impaired, 762 F.3d 152, 157 n.4 (1st Cir. 2014). But given that the government did not raise the waiver issue, we will address Graf's argument.

-11-

affidavit statements -- was sufficient error such that we should vacate the denial of his motion to suppress and remand it.

We discuss each of these arguments in turn.

**Substantial Preliminary Showing Under <u>Franks</u>**

Addressing Graf's primary argument requires us to unpack it. In so doing, we are left with two distinct issues. The first is a generally applicable legal proposition -- as a procedural matter, whose evidence is a trial judge allowed to consider in making the threshold determination that a defendant has not made a substantial preliminary <u>Franks</u> showing? In other words, is Graf correct in arguing that a court is limited to reviewing only the materials a <u>defendant</u> submits, or is the court also permitted to consider additional evidence submitted by the government?[7] The second question is a case-specific one -- if Graf carries the day on the first point and the magistrate judge was supposed to consider only <u>his</u> offer of proof, was the evidence Graf submitted enough to make a substantial preliminary showing that Gottardi lied in the affidavit in question?[8]

---

[7] In making this argument, Graf urges us to adopt the holding of <u>United States</u> v. <u>McMurtrey</u>, 704 F.3d 502, 510 (7th Cir. 2013), where the Seventh Circuit held that "in deciding the threshold question whether to grant a <u>Franks</u> hearing, the court should have limited its consideration of new information to the defense's evidence tending to refute probable cause. The court should not have considered at that preliminary step the government's explanation of the contradictions and discrepancies."

[8] As we mentioned above, <u>Franks</u> also requires that the false statement be made knowingly or intentionally (or with reckless

-12-

Unlike the McMurtrey court, neither we nor the Supreme Court has explicitly addressed whether it constitutes legal error for a trial court to consider government evidence before deciding whether a Franks hearing is warranted. We need not do so today. For purposes of our analysis, we can assume, without deciding, that Graf's take on the first question is the correct one because, as we discuss below, he still fails on the second question.

In sum, we find that the evidence Graf submitted to the magistrate judge did not show that Gottardi lied in the affidavit in question, and therefore, Graf has not convinced us that the lower court clearly erred in denying him a Franks hearing.

### Legal Backdrop

To frame our analysis, we'll first look at what it means to make a substantial preliminary showing in the Franks context.

A search warrant affidavit "must set forth particular facts and circumstances underlying the existence of probable cause" to search. Franks, 438 U.S. at 165. Sometimes, law enforcement agents seeking search warrants rely on tips from confidential informants to form the basis of probable cause. In those cases,

---

disregard for the truth) and be necessary to the finding of probable cause. The only issue either party focuses on in this case, though, is the falsity of Gottardi's statements. That is, the government does not dispute that if Gottardi made false statements, he did so knowingly or with reckless disregard. Likewise, the government does not argue that the allegedly false statements were not necessary to the finding of probable cause, and Graf does not argue that the warrant application, on its face, was insufficient for a probable cause finding.

"the affidavit must recite some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered, and some of the underlying circumstances from which the officer concluded that the informant . . . was credible or his information reliable."  Id. (citations and quotations omitted); United States v. Gifford, 727 F.3d 92, 99 (1st Cir. 2013) ("Where the primary basis for a probable cause determination is information provided by a confidential informant, the affidavit must provide some information from which a magistrate can credit the informant's credibility.").

Assuming such conditions are met, it has long been the case that "[a]n affidavit submitted in support of a search warrant application is presumed valid."  United States v. Grant, 218 F.3d 72, 77 (1st Cir. 2000) (citations omitted); see Franks, 438 U.S. at 171.  In Franks, however, the Supreme Court was tasked with deciding whether this "presumption of validity" is absolute, or whether "in certain circumstances, a challenge [by a defendant] to a warrant's veracity must be permitted."  Franks, 438 U.S. at 164, 167, 171.

The Court decided that a "factual showing sufficient to comprise probable cause . . . [must] be a truthful showing," "in the sense that the information put forth is believed or appropriately accepted by the affiant as true."  Id. at 164-65.  Taking into consideration the practical limitations of drafting a

warrant affidavit (for instance, "an affidavit may properly be based on hearsay, on fleeting observations, and on tips received from unnamed informants"), id. at 167, the Court ultimately held that when a "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that [an evidentiary] hearing be held at the defendant's request." Id. at 155-56. If the defendant shows at the evidentiary hearing "perjury or reckless disregard," "the search warrant must be voided and the fruits of the search excluded," unless there is another basis for probable cause in the warrant besides the false statements. Id. at 156.

The high Court further mandated that to make a substantial preliminary showing, a defendant must make "allegations of deliberate falsehood or of reckless disregard for the truth . . . accompanied by an offer of proof." Id. at 171. His "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Id. He must "point out specifically the portion of the warrant affidavit that is claimed to be false" and accompany his allegations with a "statement of supporting reasons." Id. "Affidavits or sworn or otherwise reliable statements of

witnesses should be furnished, or their absence satisfactorily explained."  Id.

Against that backdrop, we turn to the specifics of Graf's case.

### No Substantial Preliminary Showing

During the trial court proceedings, Graf pressed that the government's explanation of the discrepancies in the three affidavits that named "11-25" made no sense, and so he needed a hearing to determine whether the detective was telling the truth. On appeal, however, Graf takes a different tact -- he instead distinctly implores us not to consider any additional evidence or justification from the government, urging that it is legal error to do so.  Thus, even though we know, now, that Gottardi may actually have used the designation "11-25" to refer to three different people in the three affidavits, Graf asks us not to consider that explanation.  Therefore, our review is limited to whether Graf's motion for a Franks hearing and his accompanying evidence were facially sufficient to make a substantial preliminary showing.[9]

_____

[9] We do not mean to suggest that Gottardi's explanation for the affidavit discrepancies is necessarily a legitimate one.  It's difficult to imagine how a law enforcement agent -- maintaining records of multiple criminal targets over a number of years -- would be able to keep straight several informants -- of similar pedigrees and offering similar types of information -- by using one number.

Of greater concern, however, is that, as the government concedes, to adopt such a procedure is "highly irregular," and as far as we can tell, there is no indication on this record that the justice of the peace who reviewed Gottardi's warrant applications

-16-

For the reasons discussed below, we find that Graf did not meet his burden.

Graf argues that he successfully demonstrated that Gottardi lied in the Graf affidavit in two ways. First, Graf argues, Gottardi swore in the April 2011 affidavit that "11-25 ha[d] been a very reliable informant . . . for the past several years," and that he had been able to get sign-off on "numerous" warrants by utilizing information he got from 11-25. But, Graf contends, a review of the warrant applications filed by the Somerset Sheriff's office from April 2009 to April 2011 showed that none actually listed "11-25" as an informant. Second, in two warrant applications filed <u>after</u> Graf's, both Gottardi and his colleague claimed to have relied on tips from "11-25." But, Graf argues, in both of those affidavits and in the Graf affidavit, the

---

was aware that Gottardi took up such an unusual practice. To alleviate this concern, which was shared by the magistrate judge, the government argues that a "side-by-side comparison" of the three affidavits "supports the conclusion that three different individuals had been given the designation of CI 11-25." But as our analysis shows, that is not necessarily so. An official reviewing the three affidavits could easily interpret the affidavits the way we do -- as slightly different from each other, but not inconsistent, such that all three affidavits could be describing the same informant. Thus, unless a justice of the peace has some reason to know that police would be using the same (rather specific) identifying number for multiple individuals, we agree with the magistrate judge that such a practice is "potentially misleading" and therefore "ill-advised." Because Graf did not raise the argument on appeal, however, we do not have occasion to decide today -- and therefore will not comment on -- which direction the government's justification for the affidavit discrepancies might have tipped the scale in this case.

descriptions of "11-25" are all different, suggesting that "11-25" doesn't really exist.

Graf's first point lacks luster. The fact that "11-25" does not appear in earlier search warrant affidavits is not, on its own, sufficient to make a substantial showing that Gottardi lied. As the magistrate judge indicated, it makes sense that to protect an informant's identity, law enforcement would use different numbers to identify the same person, and the Graf affidavit specifically stated that "said informant is <u>herein</u> referred to as 11-25." (Emphasis added). Thus, Gottardi's statement did not foreclose the possibility that the informant was identified by some other number in other warrant applications.

But Graf's second point gives us pause. In two warrant applications filed <u>after</u> Graf's (in July and October 2011),[10] Gottardi and a staff sergeant, Michael W. Knight, claimed to have relied on 11-25's tips. As Graf points out, however, in all three affidavits, the descriptions of 11-25 are a little different.

Specifically, in the Graf affidavit, filed in April, Gottardi says that "11-25": (1) helped him get "drug search warrants" resulting in "numerous persons being charged and convicted of various felony/misdemeanor drug offenses"; (2) was a "drug user" with a "criminal record, to include convictions for

---

[10] The July and October 2011 affidavits don't appear to be related to Graf's case.

-18-

drug related offenses"; (3) over the past several years, had "routinely assisted . . . in apprehending drug dealers, without requesting any type of consideration," while other times assisting "to hopefully gain consideration on pending criminal charges against" him; and (4) had no charges pending against him at the time and did not ask for anything in return for providing the information that incriminated Graf.

Then in the July 2011 application, Gottardi described "11-25" like this: (1) he had helped Gottardi "solve[] numerous felony level crimes, to include Robbery, burglaries and drug cases"; (2) had made controlled drug buys for police; (3) had "routinely assisted . . . over the past several years, without requesting any type of consideration," and had provided assistance even when he did not have criminal charges pending against him; (4) had a criminal record, including "felony level convictions"; (5) was a "past known drug dealer/drug user"; and (6) did not have any criminal charges pending against him at the time or request any consideration for helping out with the case.

Finally, in the October 2011 affidavit, Knight stated that Gottardi told him "11-25": (1) was a "known drug user"; (2) who had made controlled drug purchases for police; and (3) was "presently assisting [Gottardi] with apprehending drug dealers . . . in hopes that the District Attorney will take [his] cooperation

-19-

into consideration, regarding felony level criminal charges that are presently pending against [him]."

Graf argues that "taken together [these descriptions] raise a substantial question about just how many different crimes one confidential informant could have reported to Gottardi." A closer look, however, shows that while the descriptions of "11-25" are not identical in the three affidavits, as Graf concedes, the descriptions "are not necessarily inconsistent." To be sure, only the July warrant application mentions robberies and burglaries (the other two affidavits focus exclusively on drug-related crimes). But as we noted above, we view search warrant affidavits under a lens of presumed validity, and theft is not so far-removed from drug-dealing that it would raise an eyebrow that 11-25 had knowledge of both types of crimes. Further, that Gottardi mentioned robberies and burglaries in only the July affidavit, and not in the others, does not mean we should infer that 11-25 is not the same person in all three. Gottardi could simply have failed to mention the theft crimes in the April and October affidavits. Finally, while 11-25 did not have any charges pending against him in April or July, it's certainly possible that he caught one by the time October rolled around.

Thus, even without taking into account the government's explanation for the affidavits' discrepancies, we do not have a "definite and firm conviction" that Gottardi lied in his April 2011

affidavit, such that we could say that the lower court clearly erred in denying Graf's request for a <u>Franks</u> hearing. Indeed, all three descriptions of 11-25 paint a picture of a drug user who, when he feels so inclined and probably to squirrel away the good favor of police in case he needs it later, helps cops catch drug dealers.

As we have acknowledged in the past, making a substantial preliminary showing is no easy feat, particularly when law enforcement relies on tips from unnamed confidential informants. <u>See</u> <u>United States</u> v. <u>Higgins</u>, 995 F.2d 1, 3 (1st Cir. 1993) ("When the government obtains a search warrant based on information provided by a confidential informant, defendants often lack the information required to meet the exacting standards of <u>Franks</u>."). Graf, like many other defendants in the same boat, has simply failed to meet his burden of making a substantial preliminary showing -- particularly under the deferential clear error standard of review we afford to a court's denial of a <u>Franks</u> hearing.

Given our holding, then, we need not reach whether the magistrate judge procedurally erred in crediting the government's side of the story before making a final ruling on Graf's <u>Franks</u> motion -- as we discussed above, Graf's submissions fail to make the requisite showing.

## Motion to Suppress

We also briefly address Graf's secondary argument that even if it were proper for the trial court to consider the government's evidence in making its <u>Franks</u> ruling, we should "still vacate the denial of the motion to suppress on the ground that the government should not have been permitted to investigate itself."

"In order for a warrant to be voided and the fruits of the search excluded, the defendant must meet an even more exacting standard [than for a <u>Franks</u> hearing]: he must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." <u>United States</u> v. <u>Tzannos</u>, 460 F.3d 128, 136 (1st Cir. 2006) (quoting <u>Franks</u>, 438 U.S. at 156) (quotations omitted).

As we discussed above, Graf has failed to show that Gottardi made a false statement in his warrant affidavit, and certainly has not done so by a preponderance of the evidence. Graf also offers absolutely no law to support his contention that although he failed to make a preliminary showing that Gottardi lied, the magistrate judge was still under an obligation to probe further, let alone order that an investigation be conducted by a person of his choosing. Graf, in fact, does not even set out a

standard of review for this inquiry.  We consider the argument

waived for lack of development.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895

F.2d 1, 17 (1st Cir. 1990).

## CONCLUSION

For these reasons, we <u>affirm</u> the district court.