# United States Court of Appeals
## For the First Circuit

No. 19-1983

UNITED STATES OF AMERICA,

Appellee,

v.

RYAN MUMME,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, <u>Chief U.S. District Judge</u>]

Before

Lynch and Barron, <u>Circuit Judges</u>,
and Burroughs,* <u>District Judge</u>.

  <u>Mary E. Davis</u>, by appointment of the Court, with whom <u>Davis & Davis</u> was on brief, for appellant.
  <u>Benjamin M. Block</u>, Assistant United States Attorney, with whom <u>Halsey B. Frank</u>, United States Attorney, was on brief, for appellee.

January 13, 2021

---

  * Of the District of Massachusetts, sitting by designation.

**LYNCH**, **Circuit Judge**.    Ryan Mumme ("Mumme") was convicted of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2256(8)(A), and was sentenced to ninety-six months' imprisonment to be followed by lifetime supervised release.    He appeals the district court's denial of his motion to suppress statements made to investigating officers at his home and the evidence derived from the consensual seizure of his computer.    He argues that the officers unconstitutionally coerced his consent to the seizure of his computer and questioned him within the curtilage of his home.    He also appeals the denial of his renewed motion to withdraw his guilty plea, arguing that the district court erroneously failed to hold an evidentiary hearing on his claim of ineffective assistance of counsel.    Finding no error, we affirm.

## I.    Background

A.    Facts

In    March    2015,    agents    from    Homeland    Security Investigations ("HSI") informed Maine State Police Detective Christopher Tupper ("Det. Tupper") that they had evidence showing that Mumme had wired more than $16,000 to accounts in the Philippines and Russia from November 2010 to March 2015, including at least one payment to an individual in the Philippines suspected of producing child pornography.    Electronic payment records showed

that Mumme used the email address "dexter.rick@yahoo.com" to make these payments on all but one occasion.

On August 31, 2015, Det. Tupper, HSI Special Agent Gregory Kelly ("Agent Kelly"), and HSI Special Agent Chase Ossinger ("Agent Ossinger") traveled to Mumme's home in Eastport, Maine, to try to interview him about these suspicious transactions.[1] The officers drove two unmarked cars and wore plain clothes. Det. Tupper wore a recording device that remained on throughout the ensuing encounter.

Mumme's home is located at the corner of a paved road and a dirt road. The paved road runs along one side of the home and the home is located directly next to the paved road. There are other homes also located along that road. The dirt road comes off the paved road and ends in a dead-end in a grassy field past Mumme's home. The home is set back a short distance off the dirt road and the front door is located on the dirt-road side of the home. Trees and bushes surround the home on several sides, including along the dirt road, directly behind the house, and on the side of the house where the field is located. The field is situated beyond the trees and bushes directly next to the house. Across the dirt road from Mumme's home is another residence which

---

[1] They were accompanied by a civilian computer forensics analyst with the Maine State Police, who remained in Det. Tupper's vehicle and did not participate in any of the questioning.

- 3 -

is not surrounded by any trees or foliage. The grassy field at the end of the dirt road is also surrounded by a denser growth of trees and foliage on several sides. Although there is no evidence that the field would be visible from several sides because of the surrounding trees and Mumme's home, the field is completely visible from the end of the dirt road, and it is also visible from at least some portion of the paved road that runs past Mumme's home as well as from the adjacent property. There was no fence surrounding that side of the field or any other enclosure on the property that would have shielded the field from public view, nor were there any signs posted against trespassing. There was no fence around the property and there was no impediment to public access to the dirt road, which the officers believed to be a public road.[2]

The officers parked along the side of the dirt road near a recreational vehicle ("RV") which was parked on the lawn next to Mumme's house. Beyond where the RV was parked was the end of the dirt road and the field. Det. Tupper walked on a path through the bushes to the front door and knocked, but no one answered. A man then approached the officers from the direction of the RV. He identified himself as Chris Mumme and told them he was the father of Ryan Mumme, the defendant here. Mumme's father further identified himself as a former law enforcement officer and tried

---

[2] There is no evidence establishing that the dirt road was private property owned by Mumme or his father.

- 4 -

to get the officers to leave without speaking to his son.  He also told the officers that he owned the property.

While the officers were speaking with Mumme's father, Mumme drove past them on the dirt road and parked in the field about twenty yards beyond the house and the RV.  Det. Tupper told Mumme's father that they wanted to speak with Mumme and that they had information that Mumme had purchased child pornography.  Mumme's father tried to convince the officers to allow him to go speak to Mumme first to "see what he knows" because he wanted "to make sure that [Mumme] is not going to get into trouble."  He also offered to contact the officers later.  Det. Tupper told Mumme's father that Mumme is "an adult, you can't invoke his rights . . . and we can just go around you."  Det. Tupper also stated that they had driven all the way from Bangor and were going to talk to Mumme. He said "[w]e're trying to do this low key . . . and professional." Mumme's father stated "he's not going to incriminate himself that's for damn sure you know that" and "if you have information I'd like to see it or he'd like to see it."  Det. Tupper responded "[a]t this point, I'm going to ask you not to hinder our investigation and I'm gonna go talk to Ryan."  As Det. Tupper walked past Mumme's father towards the defendant, he yelled back over his shoulder, "[d]on't hinder."

Agents Kelly and Ossinger remained with Mumme's father. At some point, Mumme's father told the agents that they needed a

warrant to be standing where they were. The agents responded that they were standing on a public road where they had a right to be as much as any other private individual who could access the road. The agents believed that the dirt road was public because it was accessible from multiple properties, and Mumme's father did not assert that he owned the dirt road or tell the officers that they were trespassing or to get off his property. The agents never physically restrained Mumme's father, nor did they raise their voices to him or attempt to intimidate him. Indeed, Mumme's father was allowed to go in and out of the RV several times while Mumme was being questioned. Mumme's father never yelled to or attempted to go over and speak with Mumme while the officers were talking to Mumme.

After walking past the father, Det. Tupper approached Mumme, who was standing near the back of his truck in the grassy field. Det. Tupper stood several feet away from Mumme while they spoke. Det. Tupper informed Mumme that the officers had evidence that Mumme had sent money to a person in the Philippines who trafficked in live sex shows involving children. Mumme admitted to having paid for live sex videos but denied that the videos involved children. He also admitted to having seen child pornography online. He stated that, about a month or two before, a pixelated image of an approximately thirteen-year-old girl performing oral sex on an older man popped up on his computer while

he was searching for other pornography. Agent Kelly then joined the conversation, leaving Agent Ossinger with Mumme's father. Mumme confirmed that his father owned the property but that he was the only full-time resident of the home because his parents lived in Florida for most of the year. Neither Det. Tupper nor Agent Kelly ever informed Mumme that he was free to leave the conversation, and Mumme never asserted they were standing on his private property, told them they were trespassing, or asked them to leave the property.

Mumme admitted to using the email address "dexter.rick@yahoo.com" for the past five or six years to send monthly payments of approximately $100 to a woman in the Philippines for live sex videos. He denied having any child pornography on his computer or saved to an external hard drive. The officers told Mumme that they had a civilian analyst who could search his computer to make sure there was no child pornography on it. Mumme declined to allow the officers to search through his electronic devices, stating several times that he did not want his privacy invaded. Det. Tupper then explained to Mumme that he had two options because he refused to consent to a search of the devices:

> I can seize your house and apply for a search
> warrant or you can turn your devices over to
> me and I can apply for a search warrant to
> search your devices. And . . . either way
> that you go I'm gonna have to do a search

warrant at this point or apply for one. . . . So we can camp out in your driveway or you can turn your devices over and I can apply for a warrant, if I don't get it I will return your devices.  But at this point I can't . . . go ahead and look at it.  I have to do one or the other.  I have to either seize your whole house or just your electronics, but I can't look at them without a warrant at this point cause you told me no.

After Mumme asked what seizing and securing the house would entail, Det. Tupper explained:

I have to . . . go see a judge, is what it entails. . . .  [O]r you could turn over your computer and I still have to go see a judge but I go see that judge tomorrow and not today. And I don't go thr[ough] your entire house. But either way I can't look at that computer without a warrant so it all depends on how you . . . want me to actually take physical possession of the device.  And that's your call.  But at this point, we know that there's child pornography on that computer even if it's one image.  And if it's one image that's pixilated [sic] I'm not overly concerned with that and I don't even know if that's chargeable. . . . [W]e know that there's an awful lot of money that has gone to th[e] Philippines, we know one of the people that you sent [money to] trafficks live children . . . .  So, the choice is yours.  If you want to turn your device over I can apply for a search warrant if I don't get it, I bring it back to you untouched. . . .  Or I can get somebody to keep anybody from going in the house, and go see a judge right now, it's your call. . . .  And if you want to explain anything, if you want to talk about anything, I'm here, but I'm not gonna force ya. (Emphasis added.)

Mumme stated that "I should probably get a lawyer at this point," and Det. Tupper responded "[t]hat's your call" and it

- 8 -

"[m]akes no difference to me." Mumme repeated that he would "have to contact a lawyer." Det. Tupper stated "so am I securing your house for today" and Mumme replied "I guess you're gonna have to." Mumme then asked whether "[t]hat means I can't go in and make a phone call," to which Det. Tupper responded "[n]ope." Mumme never stated that the reason he needed to go in the house to use the phone was to call an attorney. Det. Tupper did not tell Mumme that he could not contact his lawyer or use a cell phone or some other telephone to make a phone call, but just that he could not go into the house. Det. Tupper testified at the suppression hearing that he would not allow Mumme back into the house because he was concerned about officer safety and that Mumme might try to destroy evidence.

After telling Mumme he could not go back into the house, Det. Tupper asked if there was anyone else in the house and explained that he was going to make arrangements for other officers to come secure the home. At that point, Mumme said "[y]ou know what never mind[,] [g]o ahead and go get the computer." He then allowed the officers into the home to seize his computer and hard drive. After gathering those devices, Det. Tupper reiterated that "I'm going to seize these today, apply for a search warrant tomorrow, if it's rejected, you get the stuff back . . . untouched" and "if it's not rejected . . . then we're gonna process them and if there's nothing on them, you get 'em back." He also stated

that "[i]f there's child pornography on it, we'll give you the opportunity to explain it, put it in the proper context, and we'll go from there." The officers and Mumme went back to the officers' vehicles so that Det. Tupper could give Mumme an evidence inventory sheet reflecting the items that had been seized.

Det. Tupper then informed Mumme of his Fifth Amendment rights, stating that "I want to make sure that you understand you have the right to an attorney, that you do not have to talk to me[,] . . . [and] that if you do talk to me, you know it can be used against you."[3] Mumme asked if he was being arrested, and Det. Tupper responded "[n]o[,] I am not arresting you today . . . [but] I just want you to be aware of your rights . . . [c]ause I don't want to violate them, that's why I'm going to get a search warrant for these devices." He told Mumme that "[i]f you wanna clarify something or explain something, I will listen," to which Mumme responded "[n]o, I guess I'll keep my mouth shut." Det. Tupper then told Mumme that he "didn't mean to scare [Mumme] but . . . at the end of the day those devices will speak for themselves . . . [a]nd what's on them will speak for themselves."

Shortly thereafter, Mumme told the officers that they would find child pornography on the devices and explained to them

---

[3] The officers did not provide Mumme with a full Miranda warning at any point. See Miranda v. Arizona, 384 U.S. 436, 444-45, 467-74 (1966).

how he had obtained the videos.  He also admitted that the youngest child depicted on his computer was around six years old.  At one point during this exchange, Det. Tupper said "you're scared shitless right now," to which Mumme responded "[a] little bit." Det. Tupper reiterated that he was going to apply for a search warrant and noted that there was "a low probability" that he would be rejected, "but that's going to be up to the judge."

The officers never frisked or restrained Mumme during the interview or told him that he was not free to leave.  Nor did they yell or curse at Mumme or otherwise threaten or intimidate him.  The officers calmly gave Mumme a straightforward explanation of what they intended to do and made no misrepresentations to him as to their authority to obtain a warrant.  Although the officers were all armed, the only visible firearm was Det. Tupper's holstered gun, which was never removed from its holster.

Det. Tupper included Mumme's confession in his application for a search warrant for the electronic devices, which the Maine state district court granted.  The search of the laptop computer revealed approximately sixteen images and thirty videos of child pornography.

B.    Procedural History

In December 2017, Mumme was indicted on one count of possession of child pornography.  In February 2018, Mumme filed a motion to suppress the statements made to the officers and the

- 11 -

evidence derived from the seizure and search of his devices. Mumme argued that: (1) the officers' threat to seize his home and to obtain a search warrant rendered his consent to enter his home and to seize his electronic devices involuntary; (2) the officers lacked probable cause to obtain a search warrant; (3) the officers engaged in an impermissible warrantless search when they trespassed onto private property to interrogate him; and (4) he was in custody throughout the entire interaction and so should have been provided a Miranda warning at the outset of the interrogation.

The district court held a hearing on the motion to suppress in May 2018, at which all three officers testified and the government submitted the audio recording and transcript of the conversation with Mumme, an aerial photograph of the property, and the search warrant. Neither Mumme nor his father testified at the hearing. The court issued an order denying the motion in June 2018. United States v. Mumme, No. 1:17-cr-00171-NT, 2018 WL 2729200, at *1 (D. Me. June 6, 2018).

As to the voluntariness issue, the district court held that, under the totality of the circumstances, Mumme's consent to enter the home and to seize his electronic devices was voluntary. Id. at *3-5. The court concluded that the officers' statements that they would secure the home and seek a search warrant unless Mumme consented to the seizure of his devices did not vitiate his

otherwise voluntary consent.  Id. at *3-4.  The court explained that "the officers never told Mr. Mumme that they would, with any certainty, obtain a warrant . . . [but] [r]ather, Det. Tupper stated more than once that a judge could reject his warrant application, in which case Mr. Mumme's devices would be returned to him untouched."  Id. at *4.  So the "purported threats . . . lacked the potentially coercive force of a representation that he had a warrant in hand or could definitely secure one."  Id.  Furthermore, the court determined that the officers "ha[d] a reasonable belief that a warrant would issue" and they "could reasonably assume that the image [of child pornography Mumme admitted he had viewed in the past couple of months], when taken together with the evidence of Mr. Mumme's unusual history of payments to the Philippines, including one to a suspected producer of child pornography, constituted probable cause sufficient to obtain a warrant to search Mr. Mumme's computer."  Id.  The court also concluded that the officers had the lawful authority to secure Mumme's home while they applied for a search warrant and the "choice between th[e] two lawful options" of either consenting or the officers securing the home while they sought a warrant did not render Mumme's consent involuntary.  Id. at *4 n.3.

The district court also found that none of the other circumstances of the interview indicated that Mumme's consent was coerced.  Mumme was "a 46-year-old man who evidenced his awareness

- 13 -

that he could refuse to consent to the officers' requests by doing so at least once" and he "was questioned in a conversational fashion in his own backyard by two officers in civilian clothes who did not touch or menace him in any way." Id. at *4. The court noted that "the recording of the events gives no indication that Mr. Mumme was overwhelmed or otherwise incapable of offering valid consent at the time that he consented." Id. The court rejected Mumme's assertion that he was coerced by virtue of the officers' interactions with his father, who, the court found, was never physically restrained or otherwise intimidated. Id. Finally, the court rejected Mumme's argument that he was coerced into consenting because the officers refused to allow him into the house to call a lawyer, finding that securing the home was a lawful step and Mumme "was never told that he could not use a cell phone or leave the premises to place a call to his lawyer." Id. at *5.

As to the trespass argument, the district court noted that Mumme's attorney had conceded at the motion hearing that the conversation with Det. Tupper and Agent Kelly did not take place within the curtilage of the home. Id. Based on that concession, the district court concluded that "any 'trespass' did not give rise to an impermissible search for purposes of the Fourth Amendment" "[b]ecause the claimed intrusion did not reach into a constitutionally protected area." Id.

- 14 -

Lastly, the district court held that Mumme was not in custody for purposes of Miranda, and so the failure to apprise him of his rights prior to questioning did not implicate his Fifth Amendment rights. Id. at *6. The court found that "[t]he officers were dressed in civilian clothes," "only Det. Tupper carried an exposed weapon," "Mumme was never physically restrained," "the officers never drew their weapons or otherwise threatened or attempted to intimidate him," and while "[t]he officers did not inform Mr. Mumme that he was free to leave, . . . they also never told him he could not do so." Id.

Mumme entered a conditional plea of guilty in June 2018, subject to his ability to appeal the denial of the motion to suppress. Because Mumme also challenges the denial of his motion to withdraw his plea, we describe the underlying facts.

In December 2018, Mumme filed a motion to withdraw the guilty plea because of ineffective assistance of counsel, asserting that his former attorney failed to present certain arguments or call witnesses at the suppression hearing. A hearing on the motion was held in February 2019. In the course of preparing for the hearing, Mumme's new attorney realized that Mumme was really just trying to relitigate the failed suppression motion. Mumme's attorney explained to him that he could still challenge the suppression order on appeal and challenge the effectiveness of his first attorney through a habeas petition. On the advice of

his new counsel, Mumme agreed to withdraw the motion at the hearing.

In April 2019, Mumme filed, through counsel, a renewed motion to withdraw his guilty plea against the advice of his attorney. He argued, among other things, that his first attorney was ineffective and failed to properly develop and argue the law relating to trespass and curtilage. In the renewed motion, Mumme's then-attorney reiterated that "[i]t is clear that Defendant's main concern is that he does not believe his strongest arguments for suppression were adequately raised or raised at all."[4]

In May 2019, the district court denied the renewed motion without a hearing. It stated that "the Defendant's motion is predicated entirely on his belief that if his plea is withdrawn, I will permit him to reopen and relitigate his motion to suppress," which the court stated was "mistaken." The court said that there were no grounds for relitigating that motion and that it would have found the officers were not within the curtilage during their conversation with Mumme even without defense counsel's concession at the suppression hearing. The court determined that the

---

[4] Also in the renewed motion, Mumme's then-attorney indicated his intent to file a motion to withdraw as defense counsel because of Mumme's insistence on pursuing the motion to withdraw his guilty plea against the advice of counsel. Mumme's attorney eventually did file a motion to withdraw as defense counsel for that reason, and the district court allowed that motion and appointed Mumme a new attorney for the sentencing hearing.

defendant could pursue relief either through direct appeal of the suppression order or through a habeas petition.

In September 2019, Mumme was sentenced to ninety-six months' imprisonment to be followed by lifetime supervision. He timely appealed.

## II. Denial of Motion to Suppress

Mumme first challenges the denial of the motion to suppress. In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and conclusions of law de novo. United States v. Graf, 784 F.3d 1, 6 (1st Cir. 2015). "To prevail, [a defendant] must show that no reasonable view of the evidence supports the denial of the motion to suppress." Id. (alteration in original) (quoting United States v. Belton, 520 F.3d 80, 82 (1st Cir. 2008)).

Mumme makes two primary arguments on appeal with respect to suppression: (1) his consent to allow the officers to enter his home to seize his electronic devices without a warrant was not voluntary, particularly in light of the officers' threat to obtain a warrant and not to allow him back into his home until they did so; and (2) the officers unconstitutionally intruded onto the curtilage of the home to question him, which rendered his consent involuntary.[5] We address each argument in turn.

---

[5] Mumme does not argue on appeal that the officers lacked probable cause to obtain a search warrant for his electronic

- 17 -

A.  The Defendant's Consent to Enter His Home and to Seize His Electronic Devices Was Voluntary

"Valid consent renders a warrantless search constitutionally permissible . . . ." United States v. Perez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000). "[W]hile consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 234 (1973)). The burden is on the government "to establish, by a preponderance of the evidence, that consent was 'freely and voluntarily given;' there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." Id. (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

The court must assess the totality of the circumstances in assessing the voluntariness of the defendant's consent. Schneckloth, 412 U.S. at 248-49; Perez-Montañez, 202 F.3d at 438.

_____

devices, nor does he challenge the district court's determination that he was not in custody during his interview and so was not subject to the Miranda requirements. See Miranda, 384 U.S. at 467-74. Those arguments are thus waived. See Vázquez-Rivera v. Figueroa, 759 F.3d 44, 47 & n.1 (1st Cir. 2014) (holding that challenges not presented or developed in the party's brief are "deemed waived by the total absence of argument"); United States v. Dávila-Félix, 667 F.3d 47, 51 n.5 (1st Cir. 2011) (holding that an argument not made in the defendant's opening brief was waived); Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) ("[W]e deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument.").

Factors that courts consider in determining whether consent was voluntarily given include: the defendant's age, demeanor, intelligence, education, experience, "knowledge of the right to refuse consent," and "possibly vulnerable subjective state," as well as "evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place." United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989); see also United States v. Hinkley, 803 F.3d 85, 91 (1st Cir. 2015); United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993). Ultimately, the question of the voluntariness of consent is a factual matter that we review for clear error. United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003); United States v. Rodriguez Perez, 625 F.2d 1021, 1024 (1st Cir. 1980).

The district court correctly applied the multi-part legal analysis and did not commit error, much less clear error, in its factual finding that Det. Tupper's statement to Mumme that he would seek a search warrant did not vitiate Mumme's consent to enter his home and to seize his electronic devices. "[C]onsent to a search is not invalid merely because it is secured by an officer's accurate assurance that there will soon be a lawful search anyway," and while "the law rejects consent secured by knowingly false representations . . . [,] at the same time [it] see[s] no reason to deter officers from securing convenient and prompt consensual access by conveying accurate information to a

- 19 -

recipient." United States v. Vázquez, 724 F.3d 15, 22 (1st Cir. 2013) (collecting cases); see also United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003) (holding that police officers' statement that they would secure a warrant unless the defendant consented to a search, where "the facts were sufficient to support the issuance of a search warrant, d[id] not constitute coercion"); United States v. Miller, 589 F.2d 1117, 1132 n.13 (1st Cir. 1978) ("Nor did [the officer's] assertion that he would seek a warrant if appellant did not consent make consent involuntary. 'Bowing to events, even if one is not happy about them, is not the same thing as being coerced.'" (quoting Robbins v. MacKenzie, 364 F.2d 45, 50 (1st Cir.), cert. denied, 385 U.S. 913 (1966))).

Det. Tupper and Agent Kelly made no misrepresentations to Mumme about already having a warrant to search the home or to seize his devices, nor did they tell him that they would, for certain, obtain a search warrant. Rather, they told him that they would apply for a warrant if he did not consent, and that a judge could reject the warrant application. See Perez-Montañez, 202 F.3d at 438-39 ("Nor is there anything false or unduly coercive about a statement of an intention to seek other means to obtain access to property[,] . . . [particularly where the other means] would have been a search warrant, which on any fair view of the evidence would have been amply supported by probable cause."); Twomey, 884 F.2d at 51-52 (determining that the officers'

statements "that they did not in fact have a search warrant and could be required to obtain one" weighed against a finding that consent was coerced).  They also told Mumme that if he did consent to the seizure of his electronic devices, and a judge ultimately rejected a search warrant for those devices, the officers would return the devices to him "untouched."

Mumme does not contest on appeal that the officers had probable cause to seize the electronic devices and to enter the home to effect that seizure.  The district court did not clearly err in finding that the officers reasonably believed that they had probable cause to secure a search warrant for the devices based on the evidence known to them at the time they stated they would seek a search warrant, including the evidence of Mumme's payments to a woman in the Philippines suspected of producing child pornography and his admission that he had viewed at least one image of child pornography on his computer in the last two months.  See Vázquez, 724 F.3d at 19 (holding that an officer's claim that a search will ensue unless consent is given must be "based on a reasonable assessment of the facts under the applicable law"); United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (holding that "the fact that the officers told [the defendant's roommate] that they were going to search the apartment regardless of whether she consented because they intended to get a warrant [was] not inherently coercive . . . [because] [p]robable cause had been

established and the officers had a good faith belief that a warrant would issue").  The officers simply conveyed to Mumme accurate information based on their reasonable belief regarding their lawful authority.  Under these circumstances, the officers' statements of their intent to obtain a search warrant did not render Mumme's consent involuntary.

Moreover, the district court did not commit clear error in finding that the officers' statements of their intent to secure the home while they applied for a search warrant did not render his consent involuntary.  Nor did the district court commit clear error in finding that the officers' refusal to allow Mumme to go into the house to make a phone call did not vitiate his consent.  Indeed, the Supreme Court has held that, where officers have probable cause, they may temporarily secure an individual's home and prevent unaccompanied reentry into the home during the brief period of time necessary to secure a search warrant.  Illinois v. McArthur, 531 U.S. 326, 331-33 (2001) (holding that such a seizure is reasonable under the Fourth Amendment because it is limited in time and scope and justified by the important law enforcement interest in preventing the destruction of evidence during the time necessary to secure a warrant); see also United States v. Pérez-Díaz, 848 F.3d 33, 40-41 (1st Cir. 2017) (holding that the officers' temporary seizure of the defendant's apartment was justified under McArthur because they had probable cause to believe

that he possessed child pornography, they had a reasonable belief that he would destroy evidence of the child pornography on the laptop if they did not secure the home while they applied for a search warrant, the scope of the intrusion was minimal since they did not actually search the home while waiting for the warrant but rather only stood inside it, and the duration of the seizure was limited to the time necessary to secure the warrant, which was only a few hours).

Mumme does not contest that the officers had probable cause when they told him that they would secure his home and seek a warrant. The scope and duration of the seizure also likely would have been limited. The officers told Mumme that they were going to secure the home from the outside by "camp[ing] out in [his] driveway," which was no more intrusive than the seizures approved in McArthur and Pérez-Díaz. See McArthur, 531 U.S. at 335-36 (holding that permitting reentry conditioned on observation by the police officer from inside the doorway of the home was a reasonable restriction); Pérez-Díaz, 848 F.3d at 40-41 (holding that securing the apartment by standing inside until a search warrant was obtained was reasonable). In response to Mumme's question regarding what securing the house would entail, Det. Tupper told him that they "can get somebody to keep anybody from going in the house, and go see a judge right now" or "[Mumme] could turn over [the] computer and [the officers] still [would] have to go see a

- 23 -

judge but [they would] go see that judge tomorrow and not today."

These statements that the officers intended to seek a warrant that day, if he did not consent to turn over the electronic devices, show that the seizure of the home would have been limited in duration.[6] Det. Tupper testified at the suppression hearing that he believed he needed to secure the home and prevent reentry to ensure officer safety and to prevent the possible destruction of evidence on the computer or other devices. See Pérez-Díaz, 848 F.3d at 40-41. The district court did not clearly err in finding that the officers had lawful authority to seize the home under McArthur. And telling an individual to choose between two lawful, if undesirable, alternatives does not automatically render consent involuntary. See Vázquez, 724 F.3d at 22; Lee, 317 F.3d at 33; Miller, 589 F.2d at 1132 n.13.

We also reject the defendant's argument that the officers were required to allow him back into the house while being accompanied by an officer to make a phone call, or that they were required to offer him alternative ways to contact an attorney. Nothing in McArthur requires officers to permit limited access to

---

[6] Mumme does say that he was told by the officers that he would be prevented from entering the house until the following day. But the record does not bear that out. Det. Tupper told Mumme that if Mumme denied the officers entry, Det. Tupper would "have to go see a judge" to obtain a search warrant, but if Mumme consented to the seizure of the devices, Det. Tupper would "still have to go see a judge but [would] go see that judge tomorrow and not today."

the home when they have the authority to prohibit reentry completely. 531 U.S. at 335 ("Under these circumstances, the reasonableness of the greater restriction (preventing reentry) implies the reasonableness of the lesser (permitting reentry conditioned on observation).").

Even assuming that Mumme intended to call a lawyer from inside the house, the officers did not prevent him from contacting his attorney through an alternative method, such as a cell phone. Thus, they did not force him to grant them access to his home before allowing him to speak to his attorney in a manner that might bear on the voluntariness of his consent. The district court did not clearly err in finding that the refusal to allow Mumme into the house to make a phone call did not vitiate his consent.

Finally, nothing about the other circumstances of Mumme's interaction with the officers renders the district court finding of voluntary consent clear error. And Mumme clearly knew that he could refuse consent because he initially did refuse to allow the officers into his house to seize his electronic devices and also refused to consent to a warrantless search of those devices even after they were seized.[7]

---

[7]     The defendant's reliance on Georgia v. Randolph, 547 U.S. 103 (2006), is also misplaced. In Randolph, the co-occupant who objected to the entry into the home was the same person who sought suppression of evidence being used against him as a result of that warrantless search. Id. at 107-08.

- 25 -

B.    The Officers Did Not Unconstitutionally Intrude onto the Curtilage of the Home

Mumme also argues that the officers unconstitutionally entered the curtilage of his home without a warrant, which he argues invalidated his subsequent statements and the consensual seizure of the electronic devices. Even bypassing his trial counsel's concession at the suppression hearing that the officers were not on the curtilage during their exchange with Mumme, the argument has no merit.

"[T]he area 'immediately surrounding and associated with the home' -- what our cases call the curtilage -- [is regarded] as 'part of the home itself for Fourth Amendment purposes.'" Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). As such, an unlicensed physical intrusion onto the curtilage for the purpose of gathering evidence is a search within the meaning of the Fourth Amendment and is

---

Here, Mumme attempts to rely on his father's purported objection to the officers' presence on the property without a warrant. Even if we were to accept that, under Randolph, Mumme's father's Fourth Amendment rights were violated by the officers' continued presence on the property, Mumme makes no argument for why we should expand Randolph to hold that when officers search a home based on the consent of one present individual but over the objection of another, the consenting party's rights are also violated. And he cannot now invoke the purported violation of his father's rights because he lacks standing to do so. See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); see also Kentucky v. King, 563 U.S. 452, 469-70 (2011) (explaining that an individual has no obligation to speak to police officers, "need not allow the officers to enter the premises[,] and may refuse to answer any questions at any time").

presumptively unreasonable without a warrant. Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018); Jardines, 569 U.S. at 11-12. But "[t]he Fourth Amendment does not . . . prevent all investigations conducted on private property" and "an officer may (subject to [the reasonable-expectation-of-privacy test]) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." Jardines, 569 U.S. at 6. And police officers have an implied license to approach the home through the curtilage and to knock on the front door to request an opportunity to speak to the occupant -- what is known as a "knock and talk." See id. at 8 (citing Kentucky v. King, 563 U.S. 452, 469 (2011)); Pérez-Díaz, 848 F.3d at 39; see also Miller, 589 F.2d at 1133 ("Where an owner has not attempted to secure open fields and woods from 'invasion' by a casual, or an official visitor, a police officer may cross private land in order to question the inhabitants of dwellings thereon.").

The Supreme Court has identified four factors in determining whether an area falls within or outside the curtilage: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." United States v.

Dunn, 480 U.S. 294, 301 (1987); see also United States v. Diehl, 276 F.3d 32, 38 (1st Cir. 2002) ("[T]hese factors are useful only to the extent they shed light on 'the centrally relevant consideration -- whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.'" (quoting Dunn, 480 U.S. at 301)). The determination as to whether a particular area is within or outside the curtilage is generally a mixed question of fact and law in which we review the district court's factual findings for clear error but review the ultimate constitutional conclusion de novo. Diehl, 276 F.3d at 37-38. But because Mumme's trial counsel initially conceded the curtilage issue at the suppression hearing, we review the district court's determination for plain error. See United States v. Delgado-Sánchez, 849 F.3d 1, 6 (1st Cir. 2017) ("Ordinarily, a party who fails to lodge an objection or raise an argument below is deemed to have forfeited the argument and faces plain error review."). Under the plain error standard, we assess whether Mumme can show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Id. at 7 (alteration in original) (quoting United States v. Arsenault, 833 F.3d 24, 29 (1st Cir. 2016)).

As our prior description of the property makes evident, the encounter was not on the curtilage. The field was not immediately next to the home but was separated by trees and foliage. It was not enclosed by a fence or any other sort of structure, and there was a completely unobstructed view of the field from the public dirt road and the main paved road, as well as from the adjacent residence. There is no evidence that in any way shows that the field was closely tied to the home itself. The district court's conclusion that the officers' physical intrusion onto the field to talk to Mumme did not constitute a search for purposes of the Fourth Amendment was not error, let alone clear or obvious error.[8]

And in any event, the officers had an implied license to approach the home and request an opportunity to speak with Mumme. See Jardines, 569 U.S. at 8; Pérez-Díaz, 848 F.3d at 39. There were no signs, fences, or other indicators that the officers were not allowed onto the property to speak with Mumme. Cf. United States v. Smith, 919 F.3d 1, 10 & n.6 (1st Cir. 2019). Mumme had no obligation to speak with the officers and could have ended the conversation or requested that they leave the property. See King, 563 U.S. at 469-70. Mumme chose not to do so and cannot now rely

_____

    [8] Mumme does not argue that he had a reasonable expectation of privacy in the field under Katz v. United States, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring).

- 29 -

on his father's suggestion to the officers that they needed a warrant to be on the property as a vicarious invocation of Mumme's rights.  See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978).  Mumme has not shown plain error in the denial of his suppression motion with respect to the curtilage issue.

### III. Denial of Motion to Withdraw Guilty Plea

Mumme also challenges the denial of his renewed motion to withdraw his guilty plea.  Specifically, he argues that the district court erred in refusing to hold an evidentiary hearing as to that motion so that he could develop the facts related to his ineffective assistance of counsel claim.  We review for abuse of discretion a decision not to hold an evidentiary hearing with respect to a motion to withdraw a guilty plea.  United States v. Santiago-Rivera, 805 F.3d 396, 398 (1st Cir. 2015).

We conclude that the district court did not abuse its discretion in denying the defendant's motion without a hearing. The district court justifiably found there was no "fair and just reason" for withdrawal of the plea, Fed. R. Crim. P. 11(d)(2)(B), because Mumme was simply attempting to relitigate the failed suppression motion by alleging that his first attorney failed to develop certain arguments.  The attorney who filed the motion on behalf of Mumme told the district court as much, and he eventually sought and obtained leave to withdraw as defense counsel because Mumme insisted on pursuing withdrawal of the plea against his

- 30 -

attorney's advice. Given that the district court found Mumme's suppression arguments meritless and that there was no basis to reopen the suppression motion, an evidentiary hearing was not required because his allegations would not "entitle him to relief." See United States v. Pulido, 566 F.3d 52, 57 (1st Cir. 2009).

Moreover, we decline to remand for an evidentiary hearing on Mumme's ineffective assistance of counsel claim, see Santiago-Rivera, 805 F.3d at 398, which is predicated on the alleged failure of Mumme's first attorney to adequately litigate the suppression motion. "This is not one of those rare cases that presents 'special circumstances' justifying deviation from our general rule that 'such claims "must originally be presented to the district court" as a collateral attack under 28 U.S.C. § 2255.'" Id. (citation omitted) (first quoting United States v. Vega Molina, 407 F.3d 511, 531 (1st Cir. 2005); and then quoting United States v. Colón-Torres, 382 F.3d 76, 84 (1st Cir. 2004)).

IV. Conclusion

The defendant's arguments are without merit and we affirm his conviction.

Affirmed.