# United States Court of Appeals
## For the First Circuit

No. 15-1977

UNITED STATES OF AMERICA,

Appellee,

v.

ÁNGEL LUIS PÉREZ-DÍAZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Andrew S. McCutcheon, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, and Vivianne M. Marrero, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant.
Marshal D. Morgan, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Juan Carlos Reyes-Ramos, Assistant United States Attorney, were on brief, for appellee.

February 3, 2017

**TORRUELLA**, **Circuit Judge**.  Ángel Luis Pérez-Díaz ("Pérez") was convicted of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and sentenced to seventy-eight months of imprisonment and ten years of supervised release. Pérez pled guilty and conditioned his guilty plea on preserving his right to appeal the district court's denial of his motion to suppress.  In this motion to suppress, Pérez had alleged that the search and seizure of computers and other items from his apartment violated the Fourth Amendment.  The district court held two evidentiary hearings and issued a Report and Recommendation ("R&R") after each hearing, both times denying the motion to suppress.  Pérez now appeals the denial of his motion to suppress, arguing that FBI agents violated the Fourth Amendment by trespassing on the curtilage of his home, entering his apartment without his consent, and illegally seizing his property before obtaining a search warrant.  Because the district court's factual findings do not support Pérez's contentions -- and we find no clear error in these factual findings -- we reject Pérez arguments and affirm the district court.

## I.  Background

In November 2010, FBI agents conducted an undercover online session through which they downloaded child pornography. The I.P. address of the internet user from whom they downloaded

the pornography led them to the former family home of Pérez (the "Family Home").  On April 29, 2011, the FBI agents executed a search warrant on the Family Home.  The FBI agents spoke to Pérez's wife and children at the Family Home, and learned that Pérez had recently moved out.  Pérez's fourteen-year-old son told one of the FBI agents that he saw Pérez looking at pornography on Pérez's computer before Pérez moved out.  Pérez's wife told the FBI agents where Pérez presently lived and what kind of car he drove, and informed the agents that Pérez worked as a police officer for the Puerto Rico Police Department.  Upon obtaining Pérez's new address, the FBI agents traveled to his apartment, where they determined the car outside the apartment belonged to Pérez.

The parties dispute the facts surrounding the subsequent events.  Based on the testimony of the FBI agents, the agents entered the apartment building property through the back gate, which did not require force to open.  Two of the four FBI agents, led by Special Agent Tomás Ortiz, initiated a knock-and-talk[1] by knocking on the door to Pérez's apartment.  Pérez answered and talked with the agents through the door for two minutes, and then allowed the agents to enter.  Agent Ortiz asked Pérez if he could

---

[1]  A knock-and-talk is an investigative procedure where "officers who have not yet secured a warrant go to investigate a suspected crime and determine whether the suspect will cooperate." United States v. Paneto, 661 F.3d 709, 712 (1st Cir. 2011).

-3-

ask him some questions; Pérez responded in the affirmative, and showed them into the kitchen.

In the kitchen, the agents asked Pérez about his computer use. He stated he searched for pornography on his computer, and that any accidentally viewed child pornography would be on the hard drive of a broken desktop computer. When asked if he ever accidentally downloaded child pornography, Pérez stated yes. Pérez led the agents to the living room closet, where he took out a ten-year-old hard drive and gave it to one of the agents, attempting to pass it off as the hard drive of the above-mentioned desktop computer. The agents noticed a laptop on the floor of the living room and asked Pérez if he used that laptop at his prior residence (the Family Home where his wife and children still resided) and may have inadvertently downloaded or watched child pornography on it. Pérez responded that he had used the laptop at his prior residence, but that he had neither downloaded nor watched child pornography on it. One of the agents asked if Pérez could turn on the laptop to show the agents that he did not have any peer-to-peer file sharing applications installed, and at that point Pérez became evasive and stated he did not want them to touch the laptop.

At this point the agents immediately ended the interview and proceeded to secure the premises while Agent Ortiz went to

-4-

obtain a search warrant for the apartment, which he received by 12:20 that afternoon. After they obtained the warrant, the agents searched the apartment and seized several electronic media items, including the desktop computer Pérez discussed during the knock-and-talk and the laptop located on the living room floor. The desktop and the laptop yielded at least eighty images and over six hundred videos of child pornography.

Pérez tells a different story. According to his account, the agents forced open a padlock on the back gate in order to gain access to his front door; entered his apartment without his consent by pushing gently on his chest; forcefully sat him on an exercise bike and interrogated him; searched his apartment at will after he refused to cooperate; ordered him to move from the kitchen to the living room after they had completed the initial investigation; and continued to search his apartment even after he spoke to his attorney on the phone.

On May 30, 2012, a grand jury charged Pérez with possession of one or more materials which contained visual depictions of minors engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(4)(B) in the United States District Court for the District of Puerto Rico. Following the indictment, Pérez filed a motion to suppress all evidence, both physical and testimonial, recovered during the FBI agents' search

of his residence and property on April 29, 2011, arguing these pieces of evidence were the fruits of a warrantless and illegal search. After an evidentiary hearing on August 19, 2013, the magistrate judge issued a first R&R denying Pérez's motion to suppress. The magistrate judge credited the agents' testimony over Pérez's testimony. Pérez filed a timely objection, but the district court denied that objection and adopted the magistrate's R&R.

Two months later, in December of 2013, Pérez moved for reconsideration of the motion to suppress and produced new evidence, namely two blurry pictures of the padlock of the back gate purportedly taken on April 29, 2011, and an affidavit from a locksmith stating that those pictures appeared to show that the padlock had been opened by force. The court denied reconsideration because Pérez did not explain why he did not produce this evidence at the suppression hearing.

In April of 2014, Pérez moved for reconsideration again, attaching a sworn statement from a neighbor stating the customary practice in the apartment building was to lock the padlocks on the gates. Pérez stated he only just introduced the evidence because he had been unable to locate this neighbor until recently. This time the district court granted the motion for reconsideration in part, also admitting the blurry pictures of the padlock as well as

the opinion testimony of the locksmith, and scheduled another evidentiary hearing.

After a supplemental suppression hearing on October 7, 2014, the magistrate judge affirmed his initial findings in a Supplemental R&R, again crediting the FBI agents' testimony over the testimony of Pérez.

In February 2015, Pérez pled guilty to possession of child pornography under a plea agreement that preserved his right to appeal as to the district court's denial of his motion to suppress. He was sentenced to seventy-eight months of imprisonment and ten years of supervised release.  This timely appeal followed.

## II.  **Standard of Review**

This court reviews the lower court's factual findings for clear error, and reviews de novo "[t]he ultimate conclusion as to whether there is a Fourth Amendment violation."  United States v. Stokes, 829 F.3d 47, 50 (1st Cir. 2016)(alteration in original); see United States v. Rabbia, 699 F.3d 85, 91 (1st Cir. 2012).

> Clear error exists when there is a definite and firm conviction that a mistake has been committed.  Under any set of circumstances, clear error is not an easy standard to meet. This is particularly true, however, when the challenge is to a witness's credibility, due to our inability to see witnesses face-to-face or to appraise in person their demeanor and inflection. Accordingly, we are especially deferential to the district court's credibility judgments.  Indeed, absent objective evidence that contradicts a witness's story or a situation where the story itself is so internally inconsistent or implausible that no

> reasonable factfinder would credit it, the ball game
> is virtually over once a district court determines
> that a key witness is credible.

United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015)

(citations and quotation marks omitted).

### III.  Discussion

**A.  The Facts**

Pérez has presented no argument that would come anywhere near to convincing us that the district court committed clear error by crediting the testimony of Agent Ortiz.  The only objective evidence Pérez advances that would -- if credited -- cast doubt on Agent Ortiz's testimony concerns the lock on the back gate.  Agent Ortiz testified that the agents did not have to use force to enter through the back gate.  Pérez, however, claims that the back gate was locked by a padlock, and that the agents forced the padlock.  To support his claims, Pérez relies on (1) a photograph of what appears to be the padlock in question, accompanied by a locksmith's affidavit and testimony, and (2) an affidavit from one of his neighbors, and testimony from that neighbor and from his landlord.

The photograph was of such poor quality, however, that the locksmith stated that he was not sure whether the dark spots on those photographs were indications that the lock was forced, or mere rust or other stains.  The locksmith was never shown the actual lock, nor was that lock ever produced.  Pérez has also

-8-

failed to explain why he never raised the issue of the forced lock at the first hearing on his motion to suppress. Pérez has similarly failed to explain why, in a video he himself made shortly after the agents left -- a video which included the area around the back gate -- he did not focus in any way on the lock.

Pérez's neighbor no longer lived in the building at the time the knock-and-talk was conducted, and therefore cannot testify to what happened on that day; she also cannot testify to whether or not the back gate was typically locked after she moved out. Pérez's landlord admitted that he did not normally go to the apartments, and that he was not there on April 29, 2011.

The district court therefore did not commit clear error by crediting Agent Ortiz's testimony over the evidence Pérez presented and his testimony. In the analysis that follows, we therefore rely on the facts the district court found.

**B. Curtilage**

The curtilage of one's home encompasses "the area immediately surrounding and associated with the home," and it is regarded as part of the home for purposes of the Fourth Amendment. Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013).

Pérez argues that the agents violated the Fourth Amendment by trespassing on the curtilage of his home by entering through the back gate. We need not here resolve whether the area

between the back gate and the front door is curtilage, because the officers did not use force to enter it, and they did not search the area -- they only passed through it in order to knock on Pérez's front door. In Jardines, the Supreme Court found that officers had violated the Fourth Amendment by searching (using a drug-sniffing dog) the curtilage of the defendant's home; the Supreme Court also considered it "an unsurprising proposition" that the officers could have passed through the defendant's curtilage and "lawfully approached his home to knock on the front door in hopes of speaking with him." Id. at 1415 n.1. This is so, because an "implicit license typically permits the visitor to approach the home by the front path, knock promptly . . . . Complying with the terms of that traditional invitation . . . is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." Id. at 1415. The FBI agents therefore did not violate the curtilage of Pérez's home by opening the back gate or by merely walking from the back gate to the front door.

## C. Consent to Entry into Pérez's Apartment

A police officer may approach and knock on a citizen's front door, and request the opportunity to speak to the citizen, in what is known as a knock-and-talk. Kentucky v. King, 563 U.S. 452, 469-70 (2011). The citizen does not have to answer or speak

to the police officers, and if he does speak to the officers, he does not have to allow them into their homes.  Id. at 470.

"Consensual searches are a recognized exception to the Fourth Amendment's warrant requirement, but the government bears the burden to prove by a preponderance of the evidence that defendant or an authorized third party gave the consent voluntarily."  United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008) (citation omitted).  Whether the consent was given voluntarily is a question of fact that "turns on the district court's comprehensive assessment of the totality of the circumstances attending the interaction between defendant/third party and the searching officers."  Id.  Factors to be weighed in making this comprehensive assessment include, but are not limited to, "(i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics."  Id. at 264 n.2.

In considering the totality of the circumstances, we are especially swayed by the fact that Pérez is an experienced police officer.  An experienced police officer understands that when FBI agents turn up on his doorstep, he has no obligation to speak to

-11-

them.  He knows that he does not have to let them in.  If he should choose to speak to the agents or to invite them in, he also understands that he is free not to answer any questions.  Yet Pérez chose to speak to the agents through the door for two minutes.  He chose to step aside so as to let them enter.  He chose to answer a number of questions.  He chose to show them the hard drive he had hidden away.  And when the officers asked him for something he did not wish to provide -- access to his laptop -- he withdrew his consent.  Once the consent was withdrawn, the officers promptly ceased the search, and Agent Ortiz went to secure a search warrant.  The entire interaction lasted only an estimated thirty to forty-five minutes, and took place in surroundings that were familiar to Pérez -- his own home.  The FBI agents did not use any inherently coercive tactics; they asked Pérez straightforward questions, which he willingly answered.  Pérez makes much of the fact that the knock-and-talk took place at 8:30 a.m., after he had returned from a late shift the previous night, and that he was therefore tired.  However, even if we accept Pérez's testimony that he returned from work at 3:00 a.m., 8:30 a.m. is hardly unreasonable.  In addition, Pérez himself testified that he was expecting a visit from his landlord that morning.  He could not therefore have been entirely surprised to receive a knock

-12-

on his door, or been entirely unprepared to have visitors in his home.

The district court did not clearly err in finding that Pérez consented to the search and that the agents did not exceed the scope of that consent.

**D. Seizure of the Apartment**

The test for whether a temporary seizure is acceptable under the Fourth Amendment is based on reasonableness, looking at four factors set out in Illinois v. McArthur: 1) the police had probable cause to believe the property "contained evidence of a crime or contraband," (2) "the police had good reason to fear" the contraband would be destroyed before the police returned to the location with a warrant, (3) "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy," and (4) "the police imposed the restraint for a [sufficiently] limited period of time."  531 U.S. 326, 331-33 (2001).

The agents had probable cause to believe that Pérez's apartment contained evidence that he had viewed child pornography. "The standard [for probable cause] is satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found in a particular place." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (omission in original).

The agents executed a warrant on the Family Home because, in November 2010, their undercover operation had revealed that a computer there contained child pornography.  At the Family Home, the agents learned from Pérez's family members that he had lived at the Family Home during November 2010, that he used a desktop and a laptop computer there, and that he had viewed pornography on at least one of those computers.  The agents also learned that Pérez had moved out of the Family Home, and that he had taken both of his computers with him.  In addition, when the agents were in Pérez's apartment, he admitted that he had inadvertently downloaded child pornography.  There was thus a fair probability that Pérez's apartment -- in particular the computers there -- contained evidence that he had viewed child pornography.

The agents also had reason to fear that Pérez would destroy the evidence unless they secured the premises.  Pérez had learned from his conversation with the agents at his apartment that they had executed a search warrant on the Family Home looking for evidence of child pornography.  The agents had asked him whether he had accidentally downloaded child pornography.  They had also asked him to turn on his laptop (which, as Pérez appears to have known, contained images of child pornography).  The agents "reasonably could have concluded that [Pérez], consequently

-14-

suspecting an imminent search, would, if given the chance, get rid of the [evidence] fast."  McArthur, 531 U.S. at 332.

The agents also made reasonable efforts to reconcile the needs of law enforcement with the demands of personal privacy. The agents neither searched Pérez's apartment nor detained Pérez in any way.[2]  They merely remained in his apartment to ensure that no evidence would be destroyed.

Finally, the seizure lasted for only approximately three hours, from around 9:30 a.m. to around 12:20 p.m.  See id. (finding a two-hour seizure of an apartment reasonable, referring to two hours as a "limited" amount of time, and noting that "this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant").  There is no indication that Agent Ortiz did not act with diligence in securing the warrant; rather, the evidence suggests that three hours was the time required to obtain the warrant and to return to Pérez's apartment with the warrant.

Pérez has thus failed to show that the district committed clear error when it found that the temporary seizure of Pérez's apartment did not violate the Fourth Amendment.

---

[2]  Although Pérez asserts that he was not allowed to leave his apartment while it was seized, his testimony is contradicted by that of the agents, and the district court did not commit clear error by crediting their testimony over his.

## IV.  Conclusion

Pérez has failed to show that the district court committed clear error when it rejected his Fourth Amendment challenges.  The decision of the district court is therefore affirmed.

**Affirmed.**