# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-SA-00378-COA

JORDAN WALTERS                                                      APPELLANT

v.

BOARD ON LAW ENFORCEMENT OFFICER                           APPELLEE
STANDARDS AND TRAINING

DATE OF JUDGMENT:                    03/10/2022
TRIAL JUDGE:                         HON. VICKI B. DANIELS
COURT FROM WHICH APPEALED:           DESOTO COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:              FRANCIS STARR SPRINGER
ATTORNEY FOR APPELLEE:               SAMUEL PHILIP GOFF
NATURE OF THE CASE:                  CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                         AFFIRMED - 08/01/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     The DeSoto County Chancery Court affirmed the Board on Law Enforcement Officer

Standards and Training's (the Board) decision to recall Jordan Walters' professional

certificate. Walters appeals and requests a determination of whether the chancery court erred

in affirming the certificate's recall because the Board's decision was arbitrary and capricious,

in violation of his constitutional rights, and not supported by substantial evidence. Finding

no error in the court's determination, we affirm. Furthermore, we address the Board's

motion to this Court to unseal the case file before us.

## FACTS AND PROCEDURAL HISTORY

### A.     Background

¶2. Walters was originally employed by the Olive Branch Police Department (Olive Branch) as a certified full-time law enforcement officer. Walters resigned from Olive Branch in August 2019. Later that same month, he was hired by the DeSoto County Sheriff's Department. Walters' professional certificate "remain[ed] the property of the [B]oard." Miss. Code Ann. § 45-6-11(7) (Rev. 2015). The certificate was issued to Olive Branch when it became Walters' employer. When Walters left Olive Branch, the certificate was required to be returned to the Board, which would be required to "decide the disposition of [the] certificate within a reasonable time . . . ." The Board on Law Enforcement Officer Standards and Training Professional Certification Policy and Procedures Manual, pt. 301, Ch. 3, Rule 3.3(1)(D)-(E) ("Policy Rules"). The Board could then reissue the certificate to Walters' new employer or choose to inactivate, delay, annul, or revoke the certificate. Policy Rule 3.3 (1)(E).

¶3. A "report form" from Olive Branch was included with the returned certificate. This form was also required by the certification rules. Policy Rule 3.3(1)(D). Olive Branch attached to the report form documents related to two ongoing internal affairs investigations into Walters' conduct while he was an Olive Branch employee. The form also had attached documentation of a third incident of misconduct that was discovered during the two internal affairs investigations. Based on the information provided to it by Olive Branch, the Board declared Walters ineligible for a new certification. Walters requested a review of the decision by the full Board, and a hearing on the matter commenced on July 22, 2021.

B. **Four Conduct Issues Considered by the Board**

### 1. Use of Unnecessary Force During an Arrest

¶4. On April 4, 2019, an incident occurred that led a citizen[1] to complain that Walters used excessive force during his arrest. The citizen said that he could not comply with Walters' command to remove his hand from his pocket because his arm was disabled. He said that even though he told Walters about his disability, Walters grabbed his disabled left arm and threw him to the ground during his arrest. Walters and several fellow officers were investigated. Video footage of the incident captured by one officer's body camera showed that many of the allegations against the officers were unfounded. But the citizen's complaint that he was thrown to the ground with unnecessary force during the arrest was sustained. Walters was suspended for one day for the infraction. At the Board hearing, Walters stipulated that his appeals in the matter were exhausted without the finding being reversed. A "litigation hold" regarding this incident was requested on April 29, 2019.

### 2. Admission of Recording and Sharing Police Dash-Cam Videos

¶5. On August 13, 2019, an officer mentioned to Chief Don Gammage that Walters showed him a video of the April 4, 2019 excessive-force incident that led to the first internal affairs investigation. The video had been recorded from Walters' dash-mounted camera onto his personal cell phone and shared with people outside the department in violation of Olive Branch's policy.

---

[1] The complaining citizen was an African-American male.

3

¶6.    This report led to a meeting among Chief Gammage,[2] Major Leann Farr, Deputy Chief William Cox, Major Danny Dishmon,[3] and Walters. What took place at the meeting is disputed. Walters was asked about the video and admitted that he had it on his personal cell phone. He wrote down the names of people to whom he could recall showing the video. After this admission, Walters resigned, effective immediately, in lieu of termination.

¶7.    Major Farr testified that Olive Branch felt bound by the April 2019 litigation hold to make a record of the videos Walters had captured and the people to whom they were sent. Deputy Chief Cox and Major Farr testified that Walters voluntarily surrendered his cell phone, along with the security code to the cell phone, to help make this record. Deputy Chief Cox testified, "[W]e advised him that the phone contents would be downloaded." Chief Gammage, Major Farr, and Deputy Chief Cox all testified that the copy of the contents of Walters' cell phone was part of an administrative inquiry into policy violations.

¶8.    But Walters testified that the phone was taken from him after he placed it on the Chief's desk and that he was coerced into giving the security code for the phone by comments such as Chief Gammage's statement that "he should arrest me right then." Walters testified that he was "intimidated and coerced into relinquishing [his] phone." Walters did not testify that he objected to or attempted to limit the scope of the phone search. He admitted that as a police officer, he knew he could stop the search at any time, but he

---

[2] Chief Gammage was on the Board at the time of Walters' hearing, but he immediately recused himself from commenting or voting in the matter.

[3] At the time of the Board hearing, the officers' rankings were Assistant Chief Gammage, Captain Farr, and Major Cox.

4

"didn't feel like [he] was able to do that at all." After it was taken, the cell phone's contents were copied, and the phone was returned to Walters that afternoon.

¶9. The copy of Walters' cell phone contents showed that Walters had recorded and shared not just the April 2019 excessive-force incident, but a total of seventeen police department videos. According to Major Farr, the majority of the videos were of "African-American individuals, [and] usually, they were male." Major Farr testified that "[Walters] would only record the parts where he was using force on those individuals, and then he would share those." This conduct violated many of Olive Branch's policies.

### 3. Texts with Racial Slurs and Threats of Violence Against Minorities

¶10. On August 22, 2019, upon receiving the information that the majority of the cell phone videos were "showing force on African-American individuals," Major Farr requested the copy of Walters' cell phone contents be searched again for the derogatory terms "nigg*" and "ni**er." Major Farr found an excess of racial slurs and threats of violence against minorities contained in Walters' texts. Some texts captioned the videos that he shared; others described incidents from his work as an Olive Branch police officer. Other texts derided Walters' African-American co-workers. The blatantly racist texts, which were compiled by Olive Branch and attached to the internal investigation report, were sent from Walters to friends and family. The investigative report noted that

> through these text messages Walters has shown a pattern of his failure to control his personal emotions and that he was spiraling out of control and becoming more aggressive in nature. . . . He has continued to show his racist tendencies and dislike for the African American race through numerous derogatory remarks. His demeanor towards our police department,

5

subordinates and fellow officers reflected a continued pattern of disrespect, implied insubordination and veiled racism towards fellow black officers.

This conduct was also found to violate Olive Branch Police Department's policies.

### 4. Walters' Arrest

¶11. The Board was also given an expunged arrest report to consider. The arrest occurred after Walters had left Olive Branch and while he was employed at the DeSoto County Sheriff's Department. The incidents surrounding the arrest were described by Walters during his testimony. He also testified that because the alleged victim did not show up in court, the charge was eventually dropped. Walters testified that he then proceeded to have the arrest expunged from his record.

### C. The Board's Hearings and Decision

¶12. The Board, in its July 2021 hearing, originally excluded testimony regarding the text messages because the Board was concerned that the scope of the search of the cell phone's copy may have exceeded the scope of the search for which Walters relinquished his phone. The Board then met in a closed session, after which it expressed concern the information was improperly excluded. Due to this concern, the Board requested the Attorney General's Office research the "matter of whether or not that information was properly excluded." It continued the hearing until the Attorney General could relay its opinion.

¶13. The hearing resumed on October 7, 2021, after the Attorney General advised the Board

> that Rule 4.3, Subsection 1, J2 of the Board [on] Law Enforcement Officers Standards [and] Training Policies and Procedures provides . . . [t]he Board shall consider all oral and written material presented at the hearing. I'm

6

advised that this Rule controls the admission of evidence in certification hearings, and that pursuant to this Rule, the presiding officer may not exclude evidence at a certification hearing.

This hearing allowed the previously excluded testimony related to the text messages from Walters' cell phone.

¶14. In its detailed order, the Board outlined the four issues it considered in Walters' case. The Board also outlined its authority to cancel a law enforcement officer's professional certificate in three instances under Rule 4.2:

> (1) his dismissal from an agency; (2) his violation of the Law Enforcement Code of Ethics; or (3) conduct that would greatly diminish the public trust in the competency and reliability of a law-enforcement officer.

The Board then concluded that "by clear and convincing evidence" that Walters' professional certificate should be canceled for violating each of those three reasons. The Board found that Walters resigned from Olive Branch in lieu of termination, satisfying the first reason. Second, the Board found that Walters violated the Law Enforcement Code of Ethics with "unnecessary force or violence" and by revealing police videos to unauthorized people. The Board also pointed to Walters' arrest and the disturbing text messages that "reveal prejudice against a targeted minority community and the propensity for violence against members of that community" And third, the Board found that Walters' conduct risked "greatly diminishing the public trust in the competence and reliability of the law-enforcement profession—also for the four reasons . . . identified at the hearing." The Board canceled Walters' license immediately.

D. **DeSoto County Chancery Court Proceedings**

7

¶15. Walters appealed the Board's decision to the chancery court. The chancery court affirmed the Board's decision, finding that "[Walters'] resignation was, in fact, in lieu of termination." The chancery court specifically declined to rule on whether the text messages were "illegally seized" from Walters' cell phone. The court pointed out that the Board was not the body which perpetrated the alleged violation, and that "case law . . . permitted [the Board] to consider all evidence put before it in making its decision." Regarding the alleged hearsay in the expunged arrest record, the chancellor found that the Board "did not rely on one particular piece of evidence in making its decision, but a culmination of all evidence brought against the Appellant." The chancellor found that "it was within [the Board's] authority to consider such evidence in its decision-making process." The chancery court upheld the Board's decision, concluding, "[The Board's] decision to cancel Jordan Walter[s'] certificate was supported by substantial evidence, was not arbitrary or capricious, was within their power and authority, and there was no Constitutional Violation committed." Upon this disposition, Walters filed his notice of appeal.

## STANDARD OF REVIEW

¶16. "This Court assigns great deference to decisions of administrative agencies." *St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health*, 910 So. 2d 1077, 1081 (¶11) (Miss. 2005) (citing *Delta Reg'l Med. Ctr. v. Miss. State Dep't of Health*, 759 So. 2d 1174, 1176 (¶12) (Miss. 1999)). There is a rebuttal presumption in favor of the decision rendered by an agency. *Id.* (citing *His Way Homes Inc. v. Miss. Gaming Comm'n*, 733 So. 2d 764, 767 (¶9) (Miss. 1999)). "The decision of an administrative agency is not to be disturbed unless

8

the agency order was unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency's scope or powers; or violated the constitutional or statutory rights of the aggrieved party." *Bd. of L. Enf't Officers Standards & Training v. Butler*, 672 So. 2d 1196, 1199 (Miss. 1996) (citing *Sprouse v. Miss. Emp. Sec. Comm'n*, 639 So. 2d 901, 902 (Miss.1994); *Miss. Comm'n on Envtl. Quality v. Chickasaw Cnty. Bd. of Supervisors*, 621 So. 2d 1211, 1215 (Miss. 1993); *Melody Manor Convalescent Ctr. v. Miss. State Dep't of Health*, 546 So. 2d 972, 974 (Miss. 1989)). "This general law of judicial review of administrative agency action applies specifically to appeals from decisions of the Board on Law Enforcement Officer Standards and Training." *Bd. on L. Enf't Officer Standards & Training v. Rushing*, 752 So. 2d 1085, 1088 (¶8) (Miss. Ct. App. 1999) (citing *Butler*, 672 So. 2d at 1199)).

## DISCUSSION

### I.      Background

¶17.    Our statutes and regulations clearly provide the Board with considerable discretion regarding the administration of professional certification. *Miss. Dep't of Pub. Safety v. Johnson*, 66 So. 3d 703, 708 (¶12) (Miss. Ct. App. 2011); *see also Rushing*, 752 So. 2d at 1089 (¶10). Mississippi Code Annotated section 45-6-11(7) (Rev. 2015) gives the Board the right to (1) reprimand the holder of a certificate; (2) suspend a certificate upon conditions imposed by the board; or (3) cancel and recall any certificate when

    (a) The certificate was issued by administrative error;
    (b) The certificate was obtained through misrepresentation or fraud;
    (c) The holder has been convicted of any crime involving moral turpitude;
    (d) The holder has been convicted of a felony;

9

(e) The holder has committed an act of malfeasance or has been dismissed from his employing law enforcement agency; or
(f) Other due cause as determined by the board.

Miss. Code Ann. § 45-6-11(7). The Board's policy manual notes that the Board is "[v]ested by law with ownership of and full responsibility for law enforcement officers' certificates," and "the Board's policy is to ensure that certificates are issued only to fully qualified officers and revoked when appropriate . . . ." Policy Rule 3.2(1).

¶18. Furthermore, the Board's Policy and Procedures Manual contains the following code of ethics, which states in pertinent part:

> I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.
>
> I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

Policy Rule 4.4(1). Violations of this code of ethics or behavior "that would breach the established minimum standards, violate the Law Enforcement Code of Ethics or would greatly diminish the public trust in the competence and reliability of a law enforcement officer would be actionable as due cause for reprimand, suspension (under conditions), recall or cancellation of a certificate." Policy Rule 4.2 (1)(F)(2).

## II. Walters' Texts and the Fourth Amendment Exclusionary Rule

10

¶19.    Walters argues that the Board's order recalling his certificate should be reversed because it relied on records gained by an unconstitutional search and seizure of the contents of his cell phone by Olive Branch in violation of his Fourth Amendment rights under the United States Constitution and Article 3, Section 23 of the Mississippi Constitution. We disagree.

¶20.    The United States Supreme Court has established that the "'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.'" *United States v. Janis*, 428 U.S. 433, 446 (1976) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citing *United States v. Peltier*, 422 U.S. 531, 536-39 (1975))).  The Supreme Court reasoned that "(i)n sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id*. (citing *Calandra*, 414 U.S. at 348).  "[A]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Id*. at 447.  Accordingly, the United States Supreme Court has not definitively applied the exclusionary rule to civil or administrative cases.  *See Immigration and Nat. Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984); *Janis*, 428 U.S. at 447; *Calandra*, 414 U.S. at 347; *but see Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 539 (1967) (rejecting an argument that the Fourth Amendment applied only to searches that seek to uncover evidence of crime).  But our Supreme Court has interpreted the Mississippi Constitutional protections differently.

¶21.    Article 3, Section 23 of the Mississippi Constitution states:

> The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.

This section has been interpreted to "generally 'provide[] greater protections' than the Fourth Amendment." *Okhuysen v. City of Starkville*, 333 So. 3d 573, 584 (¶30) (Miss. Ct. App. 2022) (quoting *Buford v. State*, 323 So. 3d 500, 504 (¶10) (Miss. 2021)). Specifically, this Court has found that evidence should be excluded in a civil case if it was "obtained through the wrongful acts of the party seeking its admission." *Id*. at 588 (¶42) (quoting *Accu-Fab & Const. Inc. v. Ladner ex rel. Ladner*, 970 So. 2d 1276, 1284 (¶¶23-24) (Miss. Ct. App. 2000)).

¶22. More recently, this Court has held that the exclusionary rule should apply in an administrative setting when a municipality initiated civil and criminal actions against a party after a municipal officer conducted an unconstitutional search and photography of the conditions of the party's property without a warrant or consent. *Okhuysen*, 333 So. 3d at 589 (¶45). In that case, this Court held,

> The exclusionary rule should be applied in this proceeding because there is a clear and direct connection between the unconstitutional search and the proceeding. The City should not have been able to declare Okhuysen's property a public menace based on evidence that the City's own agent obtained in violation of the Mississippi Constitution . . . . This case was initiated by the same department of the same governmental entity that conducted the unconstitutional search. Thus, there is a direct connection between the unconstitutional search and the attempted use of the evidence. Moreover, although this proceeding is civil in nature, the statute under which it is brought authorizes the City to assess a penalty, and the City also initiated parallel criminal proceedings based on the same search. Under these circumstances, we hold that the City may not use evidence that it obtained from the unconstitutional search.

*Id*. at 589, 591 (¶¶45, 48). Walters attempts to use *Okhuysen* to support his case because it shows that administrative actions based on evidence gained unconstitutionally may be subject to the exclusionary rule. But the circumstances in *Okhuysen* vastly differ from the case before us today because, unlike in *Okhuysen*, Walters admittedly gave express consent and permitted his property to be searched. There is no evidence to suggest that Olive Branch received the information illegally. Accordingly, Walters' argument lacks merit because the record shows he consensually gave his phone and passcode to his Olive Branch superiors.

¶23.    A person may consent to a search, just as they may waive several constitutional rights. *Graves v. State*, 708 So. 2d 858, 862-63 (¶22) (Miss. 1997). "Mississippi has long recognized that a defendant can waive his or her rights under the warrant requirement by consenting to a search." *Id*. at 863 (¶23). But the consent must be voluntarily given. *Jones v. State ex rel. Miss. Dep't of Pub. Safety*, 607 So. 2d 23, 26-27 (Miss. 1991). "Whether a person voluntarily consents to a search 'is a question of fact to be determined by the total circumstances.'" *Moore v. State*, 933 So. 2d 910, 916 (¶20) (Miss. 2006) (quoting *Jones*, 607 So. 2d at 29). A court considers:

> whether the circumstances were coercive, occurred while in the custody of law enforcement or occurred in the course of a station house investigation. The court must also look to the individual's maturity, impressionability, experience and education. Further, the court should consider whether the person was excited, under the influence of drugs or alcohol, or mentally incompetent. If the consent occurred while the defendant was being generally cooperative, the consent is more likely to be voluntary; however, if the defendant agreed and then changed his mind, the consent should be suspect.

*Id*. at 916-17 (¶20) (quoting *Graves*, 708 So. 2d at 863).

¶24.    Here, the testimony indicates that Walters was being cooperative with Olive Branch's

13

request to copy his phone and that his consent was given freely. As a law enforcement officer, his experience with his fellow employees does not lend to the idea that he was impressionable, lacked experience, or was under the influence of drugs or alcohol. Moreover, as an experienced police officer, Walters should know that he can refuse to consent to a search. *See, e.g., United States v. Perez-Diaz*, 848 F.3d 33, 40-41 (1st Cir. 2017); *United States v. Rodriguez-Pacheco*, 948 F.3d 1, 2 (1st Cir. 2020). According to Walters' own testimony, there is no evidence of coercion other than the hyperbolic statement of Chief Gammage who stated that "he should arrest me right there." Based on these facts, as testified to by Walters, it is clear that Walters voluntarily gave the phone and the passcode to Olive Branch. A Fourth Amendment violation of Walters' rights seems highly implausible.

### III.    Expunged Arrest Record as "Uncorroborated Hearsay"

¶25.    Walters also argues that the expunged arrest record considered by the Board was "uncorroborated hearsay" and was improperly relied on by the Board. Again we disagree with Walters' arguments.

¶26.    Generally speaking, "it is well established that formal rules of practice, procedure, and evidence are more relaxed in proceedings before administrative agencies than in courts of law"; however, "[d]ue process always stands as a constitutionally grounded procedural safety net in administrative hearings." *Alston v. Miss. Dep't of Emp. Sec.*, 247 So. 3d 303, 311 (¶29) (Miss. Ct. App. 2017). Specifically, hearsay evidence is admissible in administrative hearings "so long as uncorroborated hearsay is not considered sufficient to meet the

14

substantial evidence standard." *Howell v. Miss. Emp. Sec. Comm'n*, 906 So. 2d 766, 770-71 (¶11) (Miss. Ct. App. 2004). Even uncorroborated hearsay is allowed in administrative proceedings, though it is not sufficient by itself to support an agency decision (the so-called residuum rule). *McClinton v. Miss. Dep't of Emp. Sec.*, 949 So. 2d 805, 811, 813 (¶¶15, 24) (Miss. Ct. App. 2006); *Simmons v. Miss. Dep't of Pub. Safety*, 331 So. 3d 1116, 1122 (¶19) (Miss. Ct. App. 2021).

¶27. In the present case, however, there is no need to invoke the residuum rule. Here, the Board specifically noted that their decision was explicitly based on four behavioral infractions: (1) the excessive-force finding; (2) Walters' admission of recording and sharing dash-cam videos; (3) the racially derogatory text messages; and (4) Walters' arrest. Walters' expunged arrest record was not "by itself" all that supported the agency's determination. *Simmons*, 331 So. 3d at 1122 (¶19). Furthermore, Walters testified to the details of his arrest—thereby corroborating that he was arrested. Therefore, it cannot be said that the arrest record is uncorroborated or that it was relied on by itself for the certificate's recall. For these reasons, Walters' arguments on this issue are without merit.

### IV. Motion to Lift the Seal

¶28. During the December 2021 appeal to DeSoto County chancery court, Walters filed an unopposed motion to seal the case file. Walters stated that there was no benefit to the public for access to these records, which included the entire contents of Walters' cell phone (including transcripts of the racist texts) as well as the expunged arrest record. As a result, the chancellor ordered the entire case file sealed, finding that there was no benefit for the

15

public to access these records.

¶29. On March 17, 2023, the Board filed a motion on appeal to unseal "the present case for full and complete access using the Court's electronic case filing and monitoring system." The Board's motion states that it agreed to the original order to seal the case file based on anticipated litigation Walters threatened, but the statute of limitations on that litigation had since passed. Walters' response to this Court states that the motion to seal was not related to any anticipated litigation. Walters' reason to seal was that the text messages copied from his phone and included in the record were personal in nature, with no benefit to the public. He argues that "publicizing them serves only to potentially embarrass and irreparably harm Walters and those others who were part of the messages." He also argues that exposing his expunged arrest record to the public would be "directly contrary to the word and spirit of the expungement laws."

¶30. "The Supreme Court has articulated that 'Mississippi law favors public access to public records.'" *Nowell v. Stewart*, 356 So. 3d 1217, 1231 (¶55) (Miss. Ct. App. 2022) (quoting *Est. of Cole v. Ferrell*, 163 So. 3d 921, 925 (¶18) (Miss. 2012)). "It is the policy of the Legislature that public records must be available for inspection by any person unless otherwise provided by this act." *Est. of Cole*, 163 So. 3d at 925 (¶15) (quoting Miss. Code Ann. § 25-61-1). Court filings are considered public records unless otherwise exempted by statute. *Id.* (citing *Pollard v. State*, 205 So. 2d 286, 288 (Miss. 1967)); *see, e.g.*, Miss. Code Ann. § 25-61-9 (Rev. 2018) (limiting public access to trade secrets and confidential commercial or financial information); Miss. Code Ann. § 43-21-261 (Rev. 2015) (limiting

16

disclosure of youth court records).

¶31. Even if a matter is not exempted by statute, "[a] court may, within its discretion, determine if nonexempt matters should be declared confidential or privileged, removing those records from public disclosure." *Est. of Cole*, 163 So. 3d at 925 (¶16). "In analyzing whether to seal a record, the Supreme Court explained that a trial court must "balanc[e] the parties' competing interests—the public's right of access versus confidentiality." *Butler Snow LLP v. Est. of Mayfield*, 281 So. 3d 1214, 1220 (¶27) (Miss. Ct. App. 2019). Appellate courts such as ours are given the authority to seal or unseal case files at the appellate level. Mississippi Rule of Appellate Procedure 48A(b), (e).

¶32. In this case, we determine the motion to unseal the present case file should be granted in part. With the exception of the expunged arrest record, no records in this case file could be considered confidential in any other light. Outside of the expunged arrest documents, there are no private records that would cause substantial harm to Walters. The briefs and the opinions do not contain sensitive information. Furthermore, the cell phone texts contained in the record were already shared with members of the public by Walters himself and, thus, are already available publicly. Additionally, according to the Board, the reason it originally agreed to seal the case file (Walters' impending litigation) has since become moot. After weighing the public's right of access against Walters' interest in confidentiality, we find that the balance is in favor of the public's right of access to all of the items in the case file with the exception of Walters' expunged arrest record. Accordingly, we grant the motion to unseal the record in part, and we order Walters' expunged arrest record to be the sole portion

of the record to remain under seal. Finally, we dissolve in part the seal in the chancery court based on the reasoning above.

## CONCLUSION

¶33.    Like the chancery court, we find the Board's decision to recall Walters' professional certificate was supported by substantial evidence and thus not arbitrary or capricious, nor was the decision in violation of Walters' constitutional rights. Accordingly, the Board's decision must be upheld. Finally, we grant the motion to unseal the present case file in part.

¶34.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**